UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GREG F. MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15 CV 908 DDN |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Gregory F. Mitchell for disability insurance (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401-434, 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## **I. BACKGROUND**

Plaintiff was born in 1972 and was 41 years old at the time of his hearing. (Tr. 55.) He filed his applications on May 23, 2012, alleging a November 23, 2010 onset date, and alleging disability due to diabetes, depression, anxiety, stomach ulcers, learning problems and issues with reading and comprehension, a crushed disc at L5, and sleep problems. (Tr. 135, 142, 178-79.) His applications were denied initially, and he requested a hearing before an ALJ. (Tr. 90.)

On March 25, 2013, following a hearing, the ALJ issued a decision, concluding that plaintiff was not disabled under the Act. (Tr. 35-46.) The Appeals Council denied

his request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On September 29, 2010, plaintiff was seen by Gary W. LaMonda, M.D., an internist, for a diabetic foot ulcer and checkup. Plaintiff was depressed. The Seroquel he was taking, used to treat bipolar disorder, made him groggy in the morning. (Tr. 433.)

On October 13, 2010, plaintiff was seen by Kimberly Jamison, M.D., at the Boone Hospital Center in Columbia, Missouri, for cleansing and debriding of a diabetic foot ulcer. (Tr. 364.)

On October 19, 2010, plaintiff was referred to Laura Brenner, Ph.D., a clinical psychologist, for a psychological evaluation. Dr. Brenner described plaintiff's condition as chronic depression that was exacerbated following his divorce. She diagnosed mild to moderate recurrent major depressive disorder and wanted to rule out dysthymic disorder, a mild but enduring type of depression. She indicated that plaintiff had chronic depression that affected his mood, sleep, and energy level. She assigned a Global Assessment of Functioning (GAF) score of 60, indicating moderate symptoms. In addition to Seroquel, plaintiff was taking Paxil, an antidepressant; Byetta and insulin, for diabetes; Klonopin, for epilepsy and panic disorder; and Ambien, a sleep aid. (Tr. 235-39.)

On May 10, 2011, plaintiff was seen by Dr. LaMonda for follow up. He was severely depressed and anxious although his foot ulcer had healed. Dr. LaMonda referred him for psychiatric evaluation. (Tr. 427-29.)

On February 1, 2012, plaintiff was seen by Gavin Michael Vaughn, M.D., at Missouri Orthopaedic Institute, for left lateral hip pain and left knee pain. He diagnosed left greater trochanteric bursitis, left hip pain, and left knee pain. (Tr. 573-74.)

On February 3, 2012, plaintiff underwent an MRI of his lumbar spine. The impression was: (1) diffuse narrowing of the neural canal; (2) multilevel degenerative

change; and (3) prominent compression of the left L3-L4 (lumbar spine) foramen. (Tr. 510-11.)

On April 24, 2012, plaintiff was seen at the Missouri Orthopaedic Institute for low back pain and received an epidural steroid injection. (Tr. 459-60, 584.)

On May 6, 2012, plaintiff underwent an x-ray at Boone Hospital Center which revealed a compression fracture of unknown age at the T12 (thoracic or trunk region) vertebral body. (Tr. 248.)

On August 18, 2012, plaintiff was seen at the University of Missouri Health Care emergency room with hyperglycemia. He had been pulled over by the police for weaving while driving. He had not taken his insulin for the past 24 hours. His mother had given him medication for a headache that he thought was Tylenol but was not sure. He was stabilized, given diabetic hyperglycemic reading materials, and discharged home by taxi. (Tr. 608-20.)

On October 3, 2012, plaintiff underwent a CT scan of the thoracic spine which showed no acute findings. (Tr. 630.)

Plaintiff was hospitalized October 18-23, 2016, at University of Missouri Health Care after being brought in by his family due to altered mental status and confusion. Plaintiff thought his symptoms were caused by overmedication. Psychiatry notes state that, although he had been diagnosed as bipolar, he had no mania history, and although he had been prescribed Seroquel and benzodiazepines (tranquilizers), he had never been followed by a primary care doctor. His discharge diagnoses were depression not otherwise specified, and diabetes. His GAF score at admission was 40, indicating some impairment in reality testing or communication, and at discharge was 55, indicating moderate symptoms. (Tr. 644-50.)

Plaintiff was hospitalized at SSM DePaul Health Center November 2-6, 2012 with abdominal pain, nausea, and vomiting. He was diagnosed with a gastric ulcer, possibly caused by nonsteroidal anti-inflammatory drugs (NSAIDs). His GAF score at discharge was 45. (Tr. 664-704.)

On November 12, 2012, plaintiff was seen at UP-Missouri Orthopedic Institute and received a steroid injection for low back pain. (Tr. 600.)

On March 20, 2013, plaintiff was seen by Dinu Gangure, M.D., a psychiatrist at BJC Behavioral Health, for follow up on his depression and anxiety. Plaintiff reported he was doing well and taking his medications as prescribed. Diagnoses included recurrent major depression disorder and generalized anxiety disorder. He was continued on Seroquel and Paxil. (Tr. 938-39.) Plaintiff continued treatment with Dr. Gangure between April and August 2013. (Tr. 940, 942, 943, 944, 946, 948.)

Plaintiff was hospitalized at SSM DePaul Health Center September 2–7, 2013, for an overdose of acetaminophen (Tylenol). His family reported he was exhibiting an altered mental status earlier that day. (Tr. 854-913.) At admission he stated that he had taken more medication than was prescribed in an attempt to hurt himself, a statement he later denied. (Tr. 872.) The assessment included suicidal ideation and bipolar disorder. He was diagnosed with drug overdose and discharged home to live with family with outpatient follow-up because a hospital bed was not available. (Tr. 863.)

On November 1, 2013, plaintiff was seen by psychiatrist Daniel Mamah, M.D. His mood was depressed and he was periodically tearful with dysthymia. He reported being depressed most of the time. Dr. Mamah diagnosed recurrent major depressive disorder, severe without psychotic features, and generalized anxiety disorder. Dr. Mamah assigned a GAF score of 60. (Tr. 555-57.)

On January 10, 2014, Dr. Mamah completed a Mental Residual Functional Capacity (RFC) Statement. Dr. Mamah believed plaintiff would be unable to perform in a competitive work environment or be off task 10 percent of the time during an eight-hour per-day, five day per-week job; would miss one day of work per month due to his impairments, would be unable to complete an eight-hour workday at the rate of one day per month due to his impairments, and would be expected to perform a job at 80 percent of the capacity of an average worker. Dr. Mamah indicated that for 10 percent of an eight-hour workday, plaintiff was precluded from working in coordination with or in

proximity to others without being distracted by them; completing a normal workday or work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting criticism and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 664-66.)

On January 17, 2014, plaintiff was seen by Dr. Mamah. His mood was low and anxious. His GAF score was 55. (Tr. 953-55.) Plaintiff was seen by Dr. Mamah again on January 31, 2014. His mood was angry and low. Dr. Mamah was changing his antidepressant prescription from Paxil to Effexor XR and plaintiff was frustrated by yet another medication change. His GAF score was 50. (Tr. 957-59.)

**ALJ Hearing**

On January 14, 2014, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 55-76.) He was 41 years old. He graduated from high school and obtained a certificate as an LPN. He was currently working three hours a day sorting mail, a position he acquired through the Independent Center. His supervisors did not think he would be able to work full-time as he was struggling with his current hours. (Tr. 55-59.)

He began attending college in 2012 for a year and a half to two years. He became so depressed and unmotivated that he flunked out. His back problems precluded him from repetitive lifting. He suffered from severe depression, anxiety, feelings of hopelessness, and feeling like a failure, which made it difficult to get out of bed or go to his job where he worked three hours a day. He got frustrated and tended to leave early or come in late. He would go home and cry. At home he would lie around and not really accomplish anything. He continued to have difficulty socializing in person. (Tr. 59-60.)

The Independent Center assisted him in finding an apartment. He preferred to isolate himself and suffered from social anxiety. Due to his learning disability, he was

very slow at his job which frustrated his coworkers. He was supervised by an individual from the Independent Center who also acted as his job coach. He had crying spells four or five times a week, and had no motivation to shower, shave, do dishes, etc. His housing situation was supervised by HUD and the Independent Center who conducted periodic inspections. He put off doing household chores until immediately before an inspection. (Tr. 61-63.)

He is currently receiving treatment for back pain, diabetes, depression, and anxiety. He has changed psychiatrists several times due to his insurance. He has tried four different medications with his new psychiatrist. The Independent Center has provided various assistance, including helping him find temporary employment, finding a place to live, and supervising his independent living. He worked with Alexandra Johnson at the Independent Center, meeting with her weekly and talking on the phone as needed throughout the week. He had difficulty sleeping due to anxiety and slept two to three hours on a good night. He also had difficulty with his eating and would either overeat or eat very little. He could sometimes go for days without eating. He had previously been an avid reader but now has difficulty concentrating. He has low energy and spends much of his time in bed or watching TV. (Tr. 63-65.)

Alexandra Johnson, plaintiff's caseworker from the Independent Center, also testified to the following at the hearing. She provided plaintiff community support through the center, including meeting with him once or twice a week. She helped him work on his day-to-day living skills, accompanied him to psychiatrist appointments, and helped him with coping strategies. She did not think plaintiff's job through the Independent Center was competitive employment because it was so supported by the staff there. Plaintiff had required assistance with coping with either a supervisor or coworker talking to him. She did not think plaintiff would be able to work in a competitive setting because he seemed emotionally and physically exhausted, working just three hours a day. He needed regular support from her, his placement manager, and the employment focus staff at the Independent Center. She usually had to "talk out" situations with him at least

once a week. (Tr. 68.) She observed that plaintiff struggled to have the motivation to complete many daily living tasks. He had difficulty paying rent and other bills. The staff was also concerned about him eating. He was compliant with medication but needed periodic follow-up. Plaintiff sometimes needed to be redirected mid-conversation or while trying to complete a task due to a lack of focus and confusion. She observed plaintiff's irritability and mood swings. She believed plaintiff struggled to cope with any difficult situation and with interacting with others. Plaintiff tended to interpret what others said as criticism, destroying interactions and relationships with him. (Tr. 66-71.)

A Vocational Expert (VE) testified that plaintiff could not perform his past relevant work because his past work was semi-skilled to skilled, or required more social interaction than permitted by the residual functional capacity. The ALJ then asked whether there was light unskilled work with limited public contact available for a hypothetical individual with plaintiff's age, education, work experience, and residual functional capacity. The VE testified that plaintiff could perform other work that exists in the national economy, including factory worker and cleaner. (Tr. 72-76.)

### III.   DECISION OF THE ALJ

On February 25, 2014, the ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 35-46.) At Step One, the ALJ found plaintiff had not performed substantial gainful activity since his November 23, 2010 alleged onset date. At Step Two, the ALJ found, among other things, that plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine, depression, and anxiety. At Step Three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 37.)

At Step Four, the ALJ found that plaintiff had the RFC to perform light work. He found that plaintiff could lift and/or carry and push and/or pull a maximum of 20 pounds occasionally and 10 pounds frequently; sit for a total of 6 hours during an 8 hour work

day; and walk and/or stand for up to 6 hours at a time during an 8 hour work day. Plaintiff could occasionally climb ramps and stairs, but should never climb ladders, ropes or scaffolds. Plaintiff could perform occasional stooping, kneeling and crouching, but should avoid concentrated exposure to vibration, unprotected heights and moving and dangerous machinery. The ALJ found plaintiff could understand, remember and carry out at least simple instructions and non-detailed tasks. Plaintiff could respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent. Plaintiff should not work in a setting which included constant/regular contact with the general public and should not perform work which included more than infrequent handling of customer complaints. (Tr. 39.) With this RFC, the ALJ found plaintiff was unable to perform his past relevant work. (Tr. 43.)

At Step Five, the ALJ found there were jobs that existed in significant numbers in the national economy that plaintiff could perform. Therefore, the ALJ found that plaintiff was not disabled within the meaning of the Act. (Tr. 44-45.)

The ALJ gave little weight to the opinion of treating psychiatrist Dr. Daniel Mamah because it was inconsistent with plaintiff's GAF score of 60 in his own treatment notes. The ALJ also found that Ms. Johnson was not an acceptable medical source and that her opinion that plaintiff was unable to work at competitive levels was inconsistent with plaintiff's GAF score of 60. (Tr. 43.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long

as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V.  DISCUSSION

Plaintiff claims the ALJ erred in relying on plaintiff's GAF scores in discounting the opinions of treating psychiatrist Dr. Daniel Mamah and community support counselor Alexandra Johnson. This court disagrees.

### 1. Treating Psychiatrist Dr. Daniel Mamah

Plaintiff argues the ALJ erred in weighing the opinion of treating psychiatrist Dr. Daniel Mamah. He contends the ALJ formed his own opinion of the medical evidence instead of relying on the interpretation of a treating source.

It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians. See Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014). Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ. See 20 C.F.R. §§ 404.1527(c)(1)-(6); 416.927(c)(1)-(6); Owens v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008) (when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors when assessing the weight to give it). Although an ALJ is not required to discuss all the factors in determining what weight to give a physician's opinion, the ALJ must explain the weight given the opinion and give "good reasons" for doing so. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ gave good reasons here. The ALJ reasoned that Dr. Mamah's opinion of such significantly reduced functioning was inconsistent with his own treatment notes from November 2013 assessing plaintiff's GAF score of 60, indicative of no more than moderate symptoms. (Tr. 43, 557, 561.) Plaintiff's treatment records prior to November 2013 also indicated that plaintiff was doing well, appeared psychiatrically stable, and had no side-effects from his medication. (Tr. 42, 555-56, 938, 940, 946.) Dr. Mamah indicated on his January 10, 2014 Mental RFC statement that plaintiff's GAF score was 60 and his prognosis was fair. (Tr. 664.) The ALJ also properly considered plaintiff's GAF scores in assessing the validity of Dr. Mamah's opinion. See Halverson v. Astrue, 600 F.3d 922, 930–31 (8th Cir. 2010) (while the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning); Goff v. Barnhart, 421 F.3d 785, 789, 791, 793 (8th Cir. 2005) (GAF scores of 58 and 60 support ALJ's limitation for simple, routine, repetitive work); Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (OK to consider GAF scores in reviewing ALJ's determination that treating source's opinion was inconsistent with treatment record).

The ALJ gave other good reasons for discounting Dr. Mamah's opinion. The ALJ noted that consultative examining psychologist, Dr. Laura Brenner, found that plaintiff's GAF score was 60 in October 2010. (Tr. 41-42, 43, 238.) The ALJ also noted that Dr. Mamah saw plaintiff only a "handful of times," and stated on January 24, 2014, that his mental symptoms were not even expected to occur every day or every week. (Tr. 43, 555-70, 952, 957-58.) Finally, the ALJ found Dr. Mamah's opinion was inconsistent with evidence that plaintiff attended full-time college courses after his alleged onset date. (Tr. 38, 43, 59, 238.) Allegations of depression and loss of concentration are inconsistent with a claimant's college attendance for a substantial period. Cf. House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994) (neither claimant's headaches nor his deficits prevented him from successfully attending college, culminating in bachelor's degree).

The court also notes that while the ALJ gave Dr. Mamah's opinion little weight, Dr. Mamah's limitations are not entirely inconsistent with the mental limitations the ALJ found credible and included in his residual functional capacity determination. (Tr. 39, 664-67.) Dr. Mamah indicated that plaintiff was not precluded in any aspect from understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, or asking simple questions or requesting assistance. (Tr. 664-65.) The ALJ limited plaintiff to simple instructions and non-detailed tasks, and accounted for plaintiff's limitations regarding social interaction by limiting the amount and type of interaction he could have with others, including supervisors, coworkers, and the general public. (Tr. 39.)

Because Dr. Mamah's opinion was inconsistent with other record evidence, the ALJ lawfully gave it less weight.

### 2. Community Support Counselor Alexandra Johnson

The ALJ also properly considered and gave little weight to the opinion of community support counselor, Alexandra Johnson, who testified that plaintiff was unable to work at competitive levels and struggled to keep up with the demands of working three and one-half hours a day at the community center. (Tr. 43, 66-70.) The ALJ properly noted that Ms. Johnson, who holds a master's degree in social work, was not an acceptable medical source as defined in the regulations. (Tr. 43.) See 20 C.F.R. §§ 404.1513(a) and 416.913(a). The ALJ further found Ms. Johnson's opinion was inconsistent with the GAF scores discussed above, as well as plaintiff's activity level including his ability to attend college. (Tr. 43.) This court concludes the ALJ properly considered and discounted Ms. Johnson's testimony.

### 3. Residual Functional Capacity (RFC)

Residual functional capacity is a determination based on all the record evidence, not just the medical evidence. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. §§ 404.1545 and 416.945; Social Security Ruling (SSR) 96-8p. When formulating RFC, an ALJ need not rely entirely on one doctor's opinion, nor is he limited to a simple choice of the medical opinions of record. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of plaintiff's physicians). The Commissioner uses medical sources to "provide evidence" about several factors, including RFC, but the "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2).

In formulating plaintiff's RFC in this case, the ALJ adequately accounted for plaintiff's mental symptoms by stating he was able to perform simple and non-detailed work and respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. He also stated plaintiff should not work in a setting that includes constant/regular contact with the general public, and should not perform work that includes more than infrequent handling of customer complaints. (Tr. 39.) This court concludes substantial evidence on the record as a whole supports the ALJ's findings.

After determining plaintiff's RFC, the ALJ found that it prevented the performance of his past relevant work. (Tr. 43.) The burden then shifted to the Commissioner to produce evidence of other work existing in significant numbers that plaintiff could perform based on his age, education, work experience, and RFC. The ALJ used a vocational expert to meet that burden. In response to a hypothetical question based on an individual of plaintiff's age, education, work background, and RFC, the vocational expert testified that such individual could perform work existing in significant numbers including the light and unskilled jobs of factory worker and cleaner. (Tr. 45, 72-73.) Although the

hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations the ALJ finds substantially supported by the record as a whole. See Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006). Because the hypothetical question included those impairments the ALJ found credible, and excluded those he discredited for legally sufficient reasons, the vocational expert's testimony that plaintiff could perform work existing in significant numbers, is substantial evidence in support of the ALJ's determination. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

Because plaintiff retained the RFC to perform other work, he was not disabled as defined under the Act. (Tr. 45-46.) This court concludes substantial evidence on the record as a whole supports the ALJ's decision.

## VI.  CONCLUSION

Accordingly, for the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


       S/   David D. Noce          
       **UNITED STATES MAGISTRATE JUDGE**

Signed on June 13, 2016.